IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE WASHINGTON UNIVERSITY,    )
                              )
       Plaintiff,             )
                              )
           v.                 )      C.A. No. _____
                              )
WISCONSIN ALUMNI RESEARCH     )      **JURY TRIAL DEMANDED**
FOUNDATION,                   )
                              )      **CONFIDENTIAL –**
       Defendant.             )      **FILED UNDER SEAL**

## COMPLAINT

Plaintiff THE WASHINGTON UNIVERSITY, by and through its attorneys, alleges as follows:

### PARTIES

1.     Plaintiff THE WASHINGTON UNIVERSITY ("Washington University") is a corporation organized and existing pursuant to special act of the General Assembly of the State of Missouri approved February 22, 1853 and acts amendatory thereto, having its principal place of business at One Brookings Drive, St. Louis, Missouri 63130.  Founded in 1853, Washington University now comprises approximately 3,395 instructional faculty members and 11,967 full-time students in undergraduate and graduate programs, including business, engineering, law, and medicine.  Washington University is also a major scientific institution conducting research in fields such as astrophysics, alternative energy, and medicine.  The Nobel Prize has been awarded to 23 laureates affiliated with the University, placing it among the top universities in the world by that measure.

2.     Defendant WISCONSIN ALUMNI RESEARCH FOUNDATION ("WARF") is a not-for-profit Wisconsin corporation having its principal place of business at 614 Walnut Street, Madison, Wisconsin 53726.  WARF is in the business of commercializing academic inventions.

## JURISDICTION AND VENUE

3.     This is an action alleging breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and an equitable accounting relating to WARF's conduct with respect to licensing U.S. Patent No. 5,597,815 (the "'815 Patent"), jointly owned by Washington University and WARF.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1).

4.     This Court has personal jurisdiction over WARF because of WARF's forum-related activities, including WARF's filing of multiple lawsuits to enforce the '815 Patent (and other patents) in this District, including *Abbott Labs. v. Sandoz, Inc.* (1:12-cv-00836-GMS), *Abbott Labs. v. Hospira, Inc.* (1:12-cv-00234-GMS), *Abbott Labs. v. Agila Specialties Private Ltd.* (1:12-cv-00520-GMS), *AbbVie Inc. v. Banner Pharmacaps Inc.* (1:12-cv-01228-GMS), *AbbVie Inc. v. Sun Pharm. Indus.* (1:13-cv-00138-GMS), *AbbVie Inc. v. Dr. Reddy's Labs. Ltd.* (1:13-cv-01012-GMS), and *AbbVie Inc. v. Hikma Pharm. Co.* (1:13-cv-01557-GMS).  Personal jurisdiction over WARF also exists based on WARF's relationship with Abbott Laboratories ("Abbott").[1]  As discussed in more detail below, Abbott, a Delaware corporation, is WARF's exclusive licensee of the '815 Patent.  On information and belief, WARF derives substantial revenue from Abbott's sales of drugs in this District based on the '815 Patent and related intellectual property.

5.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## WASHINGTON UNIVERSITY AND UNIVERSITY OF WISCONSIN SCIENTISTS JOINTLY APPLY FOR A PATENT

6.     Dr. Eduardo Slatopolsky is a professor of medicine and researcher in the renal division of the Washington University School of Medicine.  Over the course of his 50-year career, Dr. Slatopolsky has conducted pioneering research into kidney mineral metabolism,

---

[1] On information and belief, AbbVie Inc., an Abbott spin-off, is Abbott's successor-in-interest under the Abbott License discussed below.  References to "Abbott" in this Complaint refer to Abbott and/or AbbVie. Inc.

helped to develop important therapies, and improved the lives of untold numbers of patients suffering from kidney-related diseases.

7.      Dr. Slatopolsky has over 500 publications to his credit and has received such accolades as the Frederic C. Bartter Award from the American Society for Bone and Mineral Research, the Belding Scribner Award from the American Society of Nephrology, the Peter H. Raven Lifetime Achievement Award from the St. Louis Academy of Science, and the Amgen Lifetime Achievement Award from the International Society of Nephrology. Dr. Slatopolsky is also a Fellow of the St. Louis Academy of Science.

8.      In the early 1990s, Dr. Slatopolsky and Dr. Hector DeLuca, a researcher at the University of Wisconsin, worked together on techniques for treating illnesses associated with kidney diseases. Kidney diseases cause a host of medical complications. In particular, diseased kidneys cannot effectively process Vitamin D and remove phosphate from the blood. The body's resulting abnormal chemical balance typically causes depressed levels of blood calcium. The parathyroid glands, the body's chief calcium regulators, react to the low levels of blood calcium by producing excessive amounts of parathyroid hormone, or PTH. This condition is called "secondary hyperparathyroidism." Secondary hyperparathyroidism causes calcium to be moved from the patient's bones into her blood. This calcium loss weakens the patient's bones, leading to a complication known as renal osteodystrophy, characterized by bone pain and increased risk of deformation or fracture.

9.      Before Drs. Slatopolsky's and DeLuca's work, certain forms of Vitamin D had been used to treat both secondary hyperparathyroidism and associated renal osteodystrophy by suppressing blood PTH levels. A side effect of these treatments, however, was elevated levels of blood phosphate. Excessive phosphate in the blood can cause mineral deposits to form in a patient's soft tissue, including cardiovascular organs, leading to serious illness or death.

10.      As a result of their collaboration, Drs. Slatopolsky and DeLuca applied for a U.S. patent on July 13, 1995 (the "'815 Patent Application"). The application disclosed a method for administering a particular Vitamin D compound, called paricalcitol, in order to treat secondary

hyperparathyroidism, and thus renal osteodystrophy, without dangerously elevating a patient's blood phosphate levels.

## WASHINGTON UNIVERSITY AND WARF AGREE TO SHARE REVENUE FROM THE PATENT

11.     In November 1995, a few months after the filing of the '815 Patent Application, Washington University and WARF entered into an "Inter-Institutional Agreement for Prevention of Hyperphosphatemia in Kidney Disorder Patients" (the "IIA").  A true and correct copy of the IIA is attached to this Complaint as Exhibit A.

12.     As the IIA evidences, its purpose was to facilitate commercialization of the valuable invention of the '815 Patent Application while ensuring that both Washington University and WARF fairly shared the resulting revenue.  Washington University further desired to entrust WARF with patent prosecution, licensing, and enforcement.

13.     Accordingly, under the IIA, Washington University granted WARF the exclusive right to prepare, file, prosecute, and maintain patent rights arising from the invention; the exclusive right to enter into and enforce license agreements arising from such patent rights; and the right to keep the majority of any revenue generated by the invention.

14.     In return, as the IIA states, WARF undertook to administer license agreements related to the invention for the parties' "mutual benefit" and to "cooperate" with Washington University with respect to licensing.

15.     In Section 3, the IIA set forth a structure for the parties' revenue sharing.  Under this structure, WARF would be entitled to recover certain enforcement costs from revenue generated by the invention, and to keep 15% of the remainder, defined as "Income," as an administration fee.  After deducting the administration fee, WARF was to pay one-third of the remaining Income, defined as "Net Revenues," to Washington University annually.  WARF was to keep the remaining two-thirds of Net Revenues.

16.     The IIA also contemplated that WARF might license intellectual property subject to the IIA, such as the '815 Patent Application, as part of a portfolio of intellectual property.

Under these circumstances, according to Section 3.A(iii) of the IIA, WARF was delegated the "authority to assign relative values" among patents arising from the '815 Patent Application and other intellectual property not subject to the IIA. The relative value WARF assigned to patents arising from the '815 Patent Application would be applied to WARF's revenue from the broader portfolio to determine what amount was "Income" subject to the IIA's revenue-sharing provisions. WARF's assignment of relative value would thus determine Washington University's share of revenue from the licensed portfolio.

## THE '815 PATENT ISSUES

17.     WARF prosecuted the '815 Patent Application and obtained the '815 Patent, which issued on January 28, 1997. The '815 Patent claims methods relating to administering paricalcitol in order to treat renal osteodystrophy without elevating the patient's blood phosphate levels.

18.     Drs. Slatopolsky and DeLuca assigned their interests in the '815 Patent to Washington University and WARF, respectively.

## WARF LICENSES THE '815 PATENT TO ABBOTT

19.     As contemplated by the IIA, WARF obtained a licensing partner, Abbott, to commercialize the subject matter of the '815 Patent and related inventions. On information and belief, in the late 1990s, WARF and Abbott entered into a license (the "Abbott License") that would permit Abbott to manufacture and sell certain types of Vitamin D-related drugs for treating conditions associated with kidney diseases. The Abbott License included an exclusive license to the '815 Patent, along with other intellectual property not subject to the IIA.

20.     Abbott was required to pay WARF royalties on the Abbott License's portfolio of intellectual property. Because the portfolio included the '815 Patent, WARF would owe a portion of the Abbott License royalties to Washington University based on WARF's assignment of value to the '815 Patent relative to the broader portfolio.

21.     The FDA approved Abbott's application for Zemplar, a brand-name form of paricalcitol, for treatment of secondary hyperparathyroidism. Abbott began selling Zemplar and,

due to Zemplar's use of intellectual property under the Abbott License, remitting a portion of its Zemplar revenue to WARF.

## WARF CHARACTERIZES THE '815 PATENT AS "ANCILLARY" AND ASSIGNS IT NEGLIGIBLE RELATIVE VALUE

22.     WARF made its first royalty payments to Washington University under the IIA by 1998. Prior to April 2001, Washington University asked WARF for information about how it had computed the royalties paid to Washington University under the IIA in the years up to that time.

23.     On April 4, 2001, WARF responded to Washington University via letter. A true and correct copy of this letter is attached to this Complaint as Exhibit B. WARF's letter explained that the royalties paid to Washington University were generated from a "License Agreement," referring to the Abbott License.

24.     WARF stated that it assigned 70% of the value of the License Agreement portfolio to certain patents not subject to the IIA, which it labeled as "compound" patents. WARF assigned the remaining 30% of value to 31 other patents — comprising 30 patents not subject to the IIA, plus the '815 Patent — which it labeled as "ancillary patents." WARF stated that it assigned each of these "ancillary" patents an equal share of the remaining 30% of value, or less than 1% each. According to WARF, therefore, after subtracting WARF's roughly two-thirds share, Washington University was entitled to less than one-third of one percent of WARF's Zemplar royalties on account of the licensing of the '815 Patent. The message of WARF's valuation was clear: the '815 Patent was essentially worthless.

25.     Notably, WARF's letter did not state that Abbott was practicing the '815 Patent. On the contrary, as a justification for the '815 Patent's "ancillary" classification, WARF stated, "[I]n many cases, it is difficult if not impossible for WARF to determine whether or not the patent is being used by the Licensee at this time," referring to Abbott and Zemplar. WARF's disclosure that it had assigned most of the Abbott License's value to the non-IIA "compound" patents further implied that Zemplar practiced *those* patents, not the '815 Patent. Washington

University had no reason to know that WARF's statements were untrue and that its valuation was improper, particularly given WARF's assurance that it had apportioned value among the Abbott License patents according to its "regular practice" and "policy."

## WASHINGTON UNIVERSITY RECEIVES A SUBPOENA RELATING TO THE '815 PATENT

26.     Over the next decade, WARF made small periodic payments to Washington University from its Zemplar licensing revenues based on the tiny percentage WARF had assigned as the '815 Patent's "relative value." The statements accompanying WARF's royalty checks provided little detail; they did not, for instance, state the amount of Abbott License royalties WARF had received. At no time did WARF provide Washington University additional information about the licensing, enforcement, treatment, or characterization of the '815 Patent. Having delegated and entrusted the '815 Patent's licensing and enforcement to WARF pursuant to the commitments contained in the IIA, and having been promised that WARF would "cooperate" with Washington University in the licensing of the '815 Patent, Washington University had no reason to suspect that WARF was acting for anything other than the parties' "mutual benefit," as WARF promised in the IIA.

27.     In late 2012, Washington University received a subpoena from Hospira, Inc., defendant in an infringement lawsuit filed in this District on the '815 Patent. The subpoena sought documents relating to Washington University's research on Zemplar, the '815 Patent, and Dr. Slatopolsky. In compiling responsive documents, Washington University revisited the IIA and WARF's 2001 letter. As set forth below, further investigation triggered by the subpoena revealed that the value WARF had assigned to the '815 Patent for purposes of allocating royalties to Washington University was improper. The '815 Patent was in fact worth far more than the virtually negligible value WARF had assigned to it.

## THE '815 PATENT HAD BEEN LISTED IN THE ORANGE BOOK, CONFIRMING ITS SUBSTANTIAL VALUE

28.     The principal source of value in a drug-related patent is its role in protecting a pharmaceutical company from competition. A patent grants an innovator drug company the right

to sue to prevent a competitor from introducing a generic version of the drug. Under the regulatory scheme established by the Hatch-Waxman Act, moreover, a patent that is listed in the FDA publication "Approved Drug Products with Therapeutic Equivalence Evaluations," known as the "Orange Book," gives rise to additional, automatic exclusivity benefits against generic competition by delaying FDA approval of the generic version. A patent can be listed in the Orange Book if the pharmaceutical company offering a drug represents that the patent claims the drug or a method of using such drug and a claim of patent infringement could reasonably be asserted against an unlicensed generic competitor, *i.e.*, if the patent covers the drug in question or its use.

29.     As a result of its investigation triggered by the Hospira subpoena, Washington University discovered that, by late 2011, the '815 Patent had been listed in the Orange Book as a patent covering Zemplar. The Orange Book listed only five such patents; of these, at most three, including the '815 Patent, were WARF-owned in part or in whole. This meant that the '815 Patent was one of at most three Abbott License patents that were represented to protect Zemplar's exclusivity. Far from being "ancillary" or meriting a sub-one percent relative value, the '815 Patent was in fact a core patent within the Abbott License portfolio.

30.     In addition, among the WARF-owned patents listed in the Orange Book for Zemplar, the '815 Patent will be the last to expire. The '815 Patent therefore granted WARF and Abbott the longest potential market exclusivity period among these patents. This was an extremely valuable tool in maintaining Zemplar's market exclusivity, and further reflected the '815 Patent's substantial value.

31.     Moreover, the Orange Book listing is inconsistent with WARF's justification for the '815 Patent's low value — its assertion in the 2001 letter that "it [was] difficult if not impossible for WARF to determine whether or not the patent [was] being used by the Licensee [*i.e.*, Abbott] at this time." The listing of the '815 Patent in the Orange Book for Zemplar was a representation to the world that Abbott *was* using the patent.

32.     In short, WARF's classification of the '815 Patent as "ancillary," and the virtually negligible relative value it assigned to the patent, were completely at odds with the patent's real-world value, as reflected in the Orange Book listing.  At no time, moreover, had WARF brought information about the importance of the '815 Patent, as reflected in its Orange Book listing, to Washington University's attention.

## WARF AND ABBOTT HAD PROMINENTLY ASSERTED THE '815 PATENT IN LAWSUITS

33.     After receiving the Hospira subpoena, Washington University uncovered still more troubling information about WARF's valuation of the '815 Patent.  Unbeknownst to Washington University, WARF and Abbott had begun filing patent infringement lawsuits in this District (of which the Hospira litigation was just one) that prominently featured the '815 Patent.

34.     On further investigation, Washington University learned that WARF and Abbott had (or have since) asserted the '815 Patent in at least seven Delaware cases: *Abbott Labs. v. Sandoz, Inc.* (1:12-cv-00836-GMS), *Abbott Labs. v. Hospira, Inc.* (1:12-cv-00234-GMS), *Abbott Labs. v. Agila Specialties Private Ltd.* (1:12-cv-00520-GMS), *AbbVie Inc. v. Banner Pharmacaps Inc.* (1:12-cv-01228-GMS), *AbbVie Inc. v. Sun Pharm. Indus.* (1:13-cv-00138-GMS), *AbbVie Inc. v. Dr. Reddy's Labs. Ltd.* (1:13-cv-01012-GMS), and *AbbVie Inc. v. Hikma Pharm. Co.* (1:13-cv-01557-GMS).

35.     In three of these cases — *AbbVie Inc. v. Banner Pharmacaps Inc.*, *AbbVie Inc. v. Sun Pharm. Indus.*, and *AbbVie Inc. v. Hikma Pharm. Co.* — the '815 Patent was or is the *only* patent asserted and thus the *only* means for WARF and Abbott to maintain Zemplar's market exclusivity.  Meanwhile, WARF continued to pay Washington University as if the '815 Patent were worth no more than the dozens of other "ancillary" Abbott License patents — even though those patents, on information and belief, have *never* been asserted to protect Zemplar, the sole or primary revenue generator under that license.

36.     WARF's Delaware complaints had another effect:  they still further contradicted WARF's 2001 assertion that determining whether Abbott was practicing the '815 Patent was

difficult.  WARF alleged in the complaints that, regarding the '815 Patent, "there is no substantial non-infringing use of paricalcitol capsules that is authorized in the United States." According to WARF, in other words, essentially *any* paricalcitol capsules necessarily practiced the '815 Patent.  Contrary to WARF's 2001 letter, based on this allegation, determining whether Abbott — or any other entity — practiced the '815 Patent should have been as simple as "reading the label" on the drug at issue.  WARF never notified Washington University, however, that its 2001 statement had been incorrect.

37.     In light of these facts, WARF could not have properly characterized the '815 Patent as "ancillary" within the Abbott License portfolio.  A proper relative valuation of the '815 Patent within the portfolio would have been far greater than the less-than-one percent that WARF assigned to it.  At no point did WARF revalue the '815 Patent within the Abbott License portfolio.  Nor did WARF inform Washington University of the '815 Patent's substantial value. Had Washington University not received the Hospira subpoena, it would likely have remained completely unaware of WARF's improper valuation of the '815 Patent.

**WARF IMPROPERLY REPRESENTED THAT IT WAS THE SOLE OWNER OF THE '815 PATENT**

38.     After receiving the Hospira subpoena, Washington University also learned that several of the complaints underlying WARF's Delaware lawsuits included the allegation that the '815 Patent was solely owned by WARF, when in fact the patent is jointly owned by WARF and Washington University.  Upon learning of WARF's false ownership allegations, Washington University checked the assignment records for the '815 Patent at the Patent and Trademark Office ("PTO").  The records showed that in October 1995, Dr. Slatopolsky had properly assigned his interest in the '815 Patent to Washington University by executing a "Patent Assignment."  WARF, however, had recorded Dr. Slatopolsky's assignment with the PTO the following month under a cover sheet identifying *WARF* as the assignee.  As a result, a subsequent search of the PTO assignment database would have identified WARF as the sole owner of the '815 Patent.

39.     Would-be generic manufacturers must notify the owners of patents listed in the Orange Book of the manufacturers' intent to seek FDA approval for a generic form of the corresponding drug. The patent owners may then file suit. Because of the incorrect assignment records showing WARF as the sole owner of the '815 Patent, and WARF's false ownership assertions in its Delaware complaints, these manufacturers would have had no idea that Washington University had an interest in the '815 Patent, and would have failed to send the required notifications to Washington University.

40.     On information and belief, this is exactly what came to pass. Prior to the Hospira subpoena, Washington University never received any notification from any drug manufacturers about their intention to make a generic form of Zemplar. As a result, it had remained unaware of the Zemplar lawsuits that confirmed the '815 Patent's substantial value.

41.     Washington University contacted WARF about its false ownership statements in or about October 2012, shortly after discovering the error in the PTO records. At that time, pending WARF complaints in the aforementioned *Sandoz*, *Hospira*, and *Banner* cases each contained these false allegations, but, on information and belief, WARF did not timely correct its untrue statements to the Court.

## ZEMPLAR GENERATED HUNDREDS OF MILLIONS OF DOLLARS IN LICENSING REVENUES TO WARF

42.     Based on the disparity between the '815 Patent's true value and the value WARF had assigned to it, Washington University investigated WARF's past royalty payments under the IIA compared to its Zemplar income. Washington University discovered that WARF had in fact obtained a windfall from Zemplar (and thus the '815 Patent), but failed to share its returns with Washington University. As Washington University learned, Zemplar had become a "blockbuster" drug, with global annual sales exceeding $1 billion in some years from 1998 through 2008, and hundreds of millions thereafter.

43.     Zemplar's success resulted in enormous payments by Abbott to WARF under the Abbott License — on information and belief, hundreds of millions of dollars in total from 1998

through 2012. During that time, WARF paid Washington University, its licensing partner and patent co-owner, only token amounts. From 1998 through 2012, WARF's payments to Washington University under the IIA — based on WARF's sub-one percent valuation of the '815 Patent — totaled approximately $1 million. On information and belief, WARF retained over $300 million of the Abbott License royalties, or well over 99%, for itself.

## WARF FAILS TO NOTIFY WASHINGTON UNIVERSITY OF A SUBPOENA TO DR. SLATOPOLSKY

44.     These were not the last of the troubling facts that Washington University uncovered through its investigation triggered by the Hospira subpoena. Washington University also learned that, prior to Washington University's receipt of its own subpoena in the Hospira matter, Hospira had served a document subpoena on Dr. Slatopolsky in his personal capacity. On information and belief, WARF's counsel in the Hospira litigation had then contacted Dr. Slatopolsky — a Washington University employee — directly and proposed to represent him, without notifying Washington University's General Counsel's office. WARF's counsel responded to the subpoena on Dr. Slatopolsky's behalf, again without contacting Dr. Slatopolsky's employer, Washington University, even though the representation involved issues that related to Dr. Slatopolsky's work for Washington University and that were plainly of significant interest to Washington University under the IIA.

## WARF REFUSES TO PROVIDE WASHINGTON UNIVERSITY WITH INFORMATION RELEVANT TO THE '815 PATENT'S VALUE

45.     WARF has continued its pattern of keeping Washington University in the dark regarding the proper valuation of the '815 Patent even to this day. In December 2012, Washington University contacted WARF's counsel and requested information relating to the patent, including what relative value was assigned to the other WARF-owned Zemplar patents in the Orange Book; whether WARF had changed any IIA valuations since its 2001 letter; and WARF's quarterly revenues under the Abbott License. Washington University reiterated these requests, asked WARF for additional information, or asked WARF to revalue the '815 Patent in January 2013 and several more times later in the year.

46.     To date, WARF has refused to respond meaningfully to Washington University's requests. WARF has refused, for example, to provide even basic information, such as the identities of the other patents in the Abbott License portfolio, that would allow Washington University to further confirm the proper relative value of the '815 Patent. And even after Washington University raised its concerns about the proper relative value of the '815 Patent with WARF, WARF continued to file lawsuits asserting the patent, including the *Sun Pharmaceutical* and *Dr. Reddy's* cases, without notifying Washington University.

47.     Most recently, via a letter dated November 2013, WARF appeared to change course, and finally agreed to provide Washington University with documents responsive to Washington University's requests. WARF insisted in advance that only a small group of Washington University personnel be permitted to view the documents, leading Washington University to believe that responsive information would be forthcoming. When WARF finally produced the documents a few weeks later, however, it became clear that WARF's promise, and its insistence on confidentiality, had been a charade. The purportedly responsive and sensitive materials consisted entirely of copies of IIA-related royalty payment letters and other documents that WARF and Washington University had already exchanged years ago, before this dispute arose. There was nothing remotely informative (or sensitive) about them.

48.     WARF's conduct described above is inconsistent with the letter and spirit of its commitments under the IIA. Given its delegation of authority over its valuable share in the '815 Patent, Washington University stood in a relationship of trust with WARF. Washington University depended on WARF to carry out its obligations under the IIA consistently with its agreement to cooperate and to act for the parties' mutual benefit. By failing to assign a proper "relative value" to the '815 Patent, by consistently keeping Washington University in the dark regarding the true and proper valuation of the '815 Patent, by repeatedly and consistently misleading this Court and generic drug manufacturers about the true ownership of the '815 Patent, and by failing to share its substantial proceeds from the Abbott License, WARF effectively cut Washington University out of the parties' bargain.

49.     Washington University does not file this action lightly.  Washington University fully supports Abbott's and WARF's efforts to assert the '815 Patent against manufacturers seeking to produce generic versions of Zemplar, and has been available to assist WARF in those efforts in whatever way it can.  Washington University would vastly have preferred to have resolved this matter privately with its licensing partner, WARF.  But WARF's refusal to properly share its royalty revenues on account of the Abbott License, and its refusal to share even relevant information about the proper valuation of the '815 Patent, have left Washington University with no choice but to file this Complaint.

## COUNT 1:  BREACH OF CONTRACT

50.     Washington University re-alleges and incorporates herein by reference the allegations contained in paragraphs 1-49.

51.     The IIA constitutes a valid and binding contract between Washington University and WARF.

52.     Washington University fully complied with all of its obligations under the IIA at all times.

53.     WARF breached the IIA through its failure to assign a proper value to the '815 Patent relative to the other intellectual property in the Abbott License, its underpayments to Washington University under the IIA, its failure to cooperate with Washington University with respect to licensing of the '815 Patent, and/or its other conduct set forth above.

54.     As a direct and proximate result of WARF's breach, Washington University received substantially less than the amount to which it was entitled under the IIA and sustained damages well in excess of $75,000, in an amount subject to proof at trial.

## COUNT 2:  BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

55.     Washington University re-alleges and incorporates herein by reference the allegations contained in paragraphs 1-49.

56.    The IIA contains an implied covenant of good faith and fair dealing that WARF would not seek to deprive Washington University of the benefits of the IIA, including the proper valuation of the '815 Patent and the benefits such a valuation would confer on Washington University.

57.    WARF, by its actions described above, breached the implied covenant of good faith and fair dealing owed to Washington University.

58.    As a direct and proximate result of these breaches, WARF damaged Washington University well in excess of $75,000, in an amount subject to proof at trial.

## COUNT 3:  BREACH OF FIDUCIARY DUTY

59.    Washington University re-alleges and incorporates herein by reference the allegations contained in paragraphs 1-49.

60.    The relationship between Washington University and WARF described above gave rise to a fiduciary duty WARF owes to Washington University to safeguard its interests. Washington University expressly entrusted to WARF the prosecution, licensing, and enforcement of Washington University's valuable intellectual property rights as an invention co-owner under the IIA.  In return, WARF explicitly committed to administer certain license agreements under the IIA for the parties' "mutual benefit" and to "cooperate" with Washington University with respect to licensing.  WARF had and has maintained to this day exclusive access to and control over all material information associated with the valuation of the '815 Patent and the calculation of royalties under the IIA.

61.    As a result, among other things, WARF had and has a duty to act for Washington University's benefit; to not deprive Washington University of the fruits of the IIA; to assign a proper value to the '815 Patent relative to the other intellectual property in the Abbott License; and to remit to Washington University appropriate payments in view of a proper valuation.

62.    WARF, by its actions described above, breached its fiduciary duty owed to Washington University.

63.     As a direct and proximate result of these breaches, WARF damaged Washington University well in excess of $75,000, in an amount subject to proof at trial.

64.     Moreover, WARF acted deliberately and in disregard of Washington University's rights, and is thus liable for punitive damages.

## COUNT 4:  EQUITABLE ACCOUNTING

65.     Washington University re-alleges and incorporates herein by reference the allegations contained in paragraphs 1-49.

66.     Washington University is presently unaware of the precise amounts Abbott has paid WARF under the Abbott License; what amounts, if any, WARF has deducted from such amounts as expenses under the IIA; what relative value WARF has assigned to other Abbott License patents; and other information necessary to determine what amounts Washington University should have been paid under the IIA.

67.     Unless WARF is required to account for such amounts, and other aspects of its computation of its payments to Washington University under the IIA, Washington University may be unable to determine what amounts it should have been paid.

68.     Washington University therefore may lack an adequate legal remedy for WARF's improper payments.

69.     WARF should accordingly be required to account for all payments to Washington University, and the Abbott License amounts and other calculations on which they are based.

14;v1 }

## PRAYER FOR RELIEF

WHEREFORE, Washington University respectfully prays for judgment and relief as follows:

1.       For damages according to proof, in excess of $75,000, as well as interest.

2.       For a declaration that WARF is obligated to make all future royalty payments to Washington University under the IIA based on a proper valuation of the '815 Patent relative to the other intellectual property in the Abbott License.

3.       For punitive damages according to proof.

4.       For an accounting of amounts received by WARF from Abbott under the Abbott License and WARF's computation of royalties due to Washington University under the IIA.

5.       For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Washington University demands a trial by jury on all issues so triable.

ASHBY & GEDDES, P.A.

John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue
OF COUNSEL:                                 P.O. Box 1150
Michael A. Jacobs                           Wilmington, DE 19899
J. Ryan Gilfoil                             (302) 654-1888
MORRISON & FOERSTER LLP                     jday@ashby-geddes.com
425 Market Street, 32nd Floor               amayo@ashby-geddes.com
San Francisco, CA 94105
(415) 268-7000                              *Attorneys for Plaintiff*
MJacobs@mofo.com
JGilfoil@mofo.com

Dated:  December 26, 2013

{4;v1 }                                     - 17 -