IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE WASHINGTON UNIVERSITY,            )
                                      )
                Plaintiff,            )
                                      )       C.A. No. 13-2091 (GMS)
        v.                            )
                                      )
WISCONSIN ALUMNI RESEARCH             )
FOUNDATION,                           )
                                      )
                Defendant.            )

## MEMORANDUM OPINION

## I.   INTRODUCTION

The plaintiff, Washington University ("WashU"), filed this action against the defendant,

Wisconsin Alumni Research Foundation ("WARF")[1] on December 26, 2013. (D.I. 1.) The

dispute arises out of a 1995 Inter-Institutional Agreement (the "1995 Agreement") that governs

the parties' relationship over U.S. Patent No. 5,597,815 ("the '815 patent"). Specifically,

WashU asserts three[2] claims: breach of contract, breach of implied covenant of good faith and

fair dealing, and breach of fiduciary duty. *Id.* at ¶¶ 50-69.

Presently before the court are WARF's motion to dismiss, WashU's partial motion for

summary judgment, and WARF's cross-motion for summary judgment. (D.I. 12; D.I. 99; D.I.

96.) For the reasons that follow, the court will grant in part and deny in part WashU's motion for

summary judgment and grant WARF's cross-motion for summary judgment. The resulting

dismissal of the case renders WARF's motion to dismiss moot.

---

[1] WARF is a not-for-profit organization that has served as the designated technology transfer organization for
University of Wisconsin ("UW") since 1925. (D.I. 13 at 5.)
[2] WashU also asserted a claim for Equitable Accounting, but admits this claim is moot in light of the damages
evidence it obtained during discovery, permitting it to calculate damages to a reasonable certainty. *See* (D.I. 100 at ¶
1, n. 4.)

## II.     FACTUAL BACKGROUND

### A.     The Development and Licensing of Paricalcitol

The breach of contract claim centers on an invention jointly developed by researchers at

WashU ("Dr. Eduardo Slatopolsky") and the University of Wisconsin ("Dr. Hector DeLuca").

(D.I. 1 at 10; D.I. 14 at 6.)  In the late 1980s, Dr. DeLuca and his University of Wisconsin

("UW") colleagues invented the 19-Nor Vitamin D analog known as paricalcitol,[3] for treating a

condition known as secondary hyperparathyroidism ("SHPT") in chronic kidney disease patients.

(D.I. 14 at 5.)  With the help of WARF, the UW inventors obtained a portfolio of patents relating

to paricalcitol.  Among these are U.S. Patent No. 5,587,497 ("the '497 compound Patent"),

which claims the new chemical entity paricalcitol, U.S. Patent No. 5,246,925 ("the '925

controlling use Patent"), that claims the FDA-approved use of paricalcitol to treat patients with

SHPT, and other patent families relating to WARF's paricalcitol compound.  (D.I. 98, Ex. A1-

16.)

In January 1993, WARF and Abbott Laboratories ("Abbott")[4] entered into a license

agreement ("the 1993 Abbott License") relating to two Vitamin D compounds – (1)

"paricalcitol" (*i.e.*, Zemplar®) and (2) "24,24-dihomo."  (D.I. 98, Ex. C12-24.)  Abbott agreed to

diligently pursue commercialization of those compounds.  *Id.* at Ex. C4 at § 3.A.  Abbott

obtained exclusive rights to the compound patent family – the '497 and the '925 Patents – along

with nonexclusive rights to 28 other paricalcitol-related patents that were referred to in the

WARF-Abbott license as the "Ancillary Patents."  (D.I. 98, Ex. C1-26.)  As consideration for the

1993 License, Abbott paid WARF a one-time license fee of $25,000 and agreed to pay "earned

---

[3] Paricalcitol is the active ingredient in AbbVie Inc.'s ("AbbVie") Zemplar® products, which were first approved by
the U.S. Food and Drug Administration on April 17, 1998.  (D.I. 98, Ex. C at 288-290.)
[4] Abbott is currently known as AbbVie, Inc.

2

royalties," including a 7 percent royalty of net sales based on the exclusively licensed patents[5] –

the '497 and the '925 Patents – and a 5 percent royalty on the "ancillary" or non-exclusively

licensed patents. *Id.* at C4. Overall, however, Abbott's royalty obligation was capped at 7

percent. *Id.* The 1993 License did not include the '815 Patent, since its subject matter had not

yet been invented.

**B.       Discovery of the '815 Invention**

In the early 1990s, Drs. Slatopolsky and DeLuca collaborated to further study and

develop techniques for treating conditions associated with kidney diseases.  (D.I. 1 at ¶ 8.)  Prior

to Drs. Slatopolsky's and DeLuca's work, certain forms of Vitamin D had been used to treat

SHPT and associated renal osteodystrophy by suppressing blood PTH levels. *Id.* at ¶ 9.  A side

effect of these treatments, however, was elevated levels of blood phosphate.[6] *Id.*

Hyperphosphotemia (excessive phosphate in the blood) can cause mineral deposits to

form in a patient's soft tissues, including cardiovascular organs, leading to serious illness or

death. *Id.* As a result of their collaboration, Drs. Slatopolsky and DeLuca discovered a method

by which paricalcitol could be administered to treat SHPT, and thus renal osteodystrophy, while

avoiding the effect of hyperphosphotemia, which led to their filing a patent application on July

13, 1995 that disclosed a method of administering paricalcitol (the "'815 Patent application") *Id.*

**C.       The Inter-Institutional Agreement**

**1.        Drafting**

Within days of filing the '815 Patent application, the parties began discussing the

possibility of entering into an inter-institutional agreement to patent, license, and commercialize

---

[5] The exclusively licensed patents are listed in Appendix B of the 1993 License and referred to as the
"Licensed Patents." (D.I. 98, Ex. C12-14.)
[6] A condition known as hyperphosphatemia. (D.I. 14 at 6.)

3

the technology. (D.I. 98, Ex. C234.) On July 21, 1995, WARF's patent counsel, Howard

Bremer ("Bremer"), wrote to Dr. E.J. Brandt, WashU's Head of Office of Technology

Management for the Medical School, enclosing a copy of a proposed agreement. *Id.* In his

letter, Bremer stated that Dr. DeLuca's decades-long Vitamin D research program involved over

150 U.S. patent applications and more that 50 licenses. *Id.* He further explained that because

most of the licenses cover multiple patents, WARF needed "the flexibility required and allowed

under Section 3.A.(iii)" (the relative value provision of the proposed agreement), because

licensees were reluctant to identify which patents included in a licensing arrangement were being

used. (*Id.*) After continued negotiations between the parties' representatives, Bremer forwarded

another draft agreement to Dr. Brandt on October 16, 1995. (D.I. 98, Ex. C236.) Dr. Brandt

responded on October 25, 1995 with only minor changes, noting that WashU "must retain the

right for the Institution/Slatopolsky to be able to 'use' Patent Rights and/or Property Rights for

academic (i.e. non-commercial) research purposes" and that the proposed agreement specifically

indicates that "WARF will send [WashU] a copy of the issued patents having Slatopolsky as co-

inventor." *Id.* at C237-38. Dr. Brandt further advised as "an 'authorized' signatory for

Washington University," no "attorney review/approval" was required before she signed off for

WashU. (D.I. 98, Ex. C236; Ex. D73-74 at 89:9-91:6; Ex. D76 at 136:2-137:9.)

**2.      Execution of the Inter-Institutional Agreement**

On November 1, 1995 (after Drs. Slatopolsky and DeLuca's discovery but before the

'815 Patent issued), WARF and WashU entered into an "Inter-Institutional Agreement for

Prevention of Hyperphosphotemia in Kidney Disorder Patients" (the "IIA") to "establish a means

for filing and prosecuting the Patent Rights, for administering and licensing the Patent Rights

and/or Property Rights, and for sharing income derived from licensing the Patent and/or Property Rights." (D.I. 1, Ex. A at 1.)

As per the IIA, WashU granted WARF the "exclusive right to prepare, file, prosecute, and maintain" patent rights arising from the invention, and the "sole discretion to make decisions with respect thereto"; the "exclusive right to negotiate, execute, administer . . . enforce" licenses, and the "sole discretion to make decisions with respect thereto"; and the "sole and exclusive right to determine whether or not the parties hereto shall engage in and prosecute any legal actions" involving patent rights. *Id.* at §§ 2.A.(i), 2.B.(i), 9.A.

WashU also agreed not to commercialize the '815 patented invention, to pay WARF a 15% administration fee for "securing and administering" any license agreements, and to accept only a 33.3% share of the revenues derived from licensing the '815 Patent, after deducting certain expenses. *Id.* at §§ 1.G, 2.B.(i), 2.B.(iv), 3.A.(i)(1). The net effect of these provisions meant that WashU would receive no more than 28.33% of the revenues attributable to licensing the '815 Patent.

The IIA also contemplates that WARF might license intellectual property subject to the IIA, as part of a larger portfolio of intellectual property. *Id.* at § 3.A.(iii). The IIA provides for a "relative value clause" under Section 3A (titled "Consideration: Net Revenues from Licensing Fees"):

> In licensing Patent Rights and/or Property Rights, WARF may include rights
> under other patents and/or other proprietary rights to which WARF owns a part or
> all right title and interest, or include in other licences certain Patent Rights or
> Property Rights, which licences may be directed primarily to other invention
> subject matter or technology than that contemplated in this Agreement. In such
> event WARF shall have the authority to assign relative values to Patent Rights
> and/or Property Rights, and other patent and/or other proprietary rights as are
> included in any such license and the portion of the gross receipts from royalties
> and other fees received by WARF under any such license, which shall be Income
> hereunder to be divided with INSTITUTION as provided in Section 3A(i), shall

> be determined in accordance with such relative values assigned to Patent Rights and/or Property Rights in proportion to the total value represented by all patent rights and/or proprietary rights which are included within such license.

*Id.*

The IIA further provides for a "cooperation clause" under Section 2A (titled "Grant: Patent Prosecution and Protection") and a "mutual benefit clause" under Section 2B (labeled "Grant: Licensing):

> WARF and INSTITUTION will use all reasonable efforts to *cooperate* with each other with respect to patent application preparation, filing, prosecution, maintenance, licensing, and execution of assignments of Patent Rights contemplated under this agreement.
>
> WARF will seek a Licensee(s) for the commercial development of Patent Rights and/or Property Rights and will administer all License Agreement(s) for the *mutual benefit* of the parties of this agreement.

(D.I. 1, Ex A. at §§ 2.A.(iii); 2.B.(ii).) (emphasis added)

The agreement also requires:

> Neither party to this Agreement makes any other warranties or representation of any kind unless expressly stated in writing in this agreement or in an amendment thereto signed by both parties.
> WARF shall have the sole and exclusive right to determine whether or not the parties hereto shall engage in and prosecute any legal actions involving Patent Rights or Property Rights . . . .
> The parties hereto are independent contractors and not joint venturers or partners.
> . . .

*Id.* at §§ 4.D; 9.A; 12.

**D.   Licensing of the '815 Patent**

On September 5, 1996, WARF advised Abbott of the soon-to-issue '815 Patent, prosecuted at WARF's expense, and requested it be added to the 1993 Abbott license portfolio to "provide additional protection for Abbott with their new 19-nor product [paricalcitol] in the marketplace." (D.I. 98, Ex. C239-40.) WARF informed Abbott that it entered into an agreement

with WashU, and the addition of the '815 Patent to the portfolio of licensed patents would result in WashU and Dr. Slatopolsky receiving a portion of WARF's income under the existing Abbott License. (D.I. 98, Ex. C 239-40.) On January 21, 1997, WARF provided WashU with the cost estimate for the prosecution of foreign patent filings. (D.I. 98, Ex. C241.)

The '815 Patent issued on January 28, 1997. (D.I. 1 at ¶ 17.) It claims methods relating to administering paricalcitol to treat renal osteodystrophy without elevating blood phosphate levels, thereby avoiding hyperphosphatemia. (D.I. 98, Ex. A17-30.) WARF advised WashU in writing on September 19, 1997 of the issuance of the U.S. '815 Patent and updated the foreign patent prosecution and licensing activity. (D.I. 98, Ex. C242.) On May 13, 1998, WARF informed WashU that it was "working on incorporating the DeLuca/Slatopolsky technology . . . as an amendment to an additional licensing agreement." (D.I. 98, Ex. C243.) In an email dated May 13, 1998, WashU requested a copy of the 1993 License after learning that the '815 Patent would be added to the license. WARF declined WashU's request on the same day citing confidentiality provisions. (D.I. 98, Ex. C244.)

**1.    The 1998 Licensing Agreement between WARF and Abbott**

On June 12, 1998, WARF informed Abbott of the '815 Patent's issuance and provided a draft amendment adding the '815 Patent to the existing list of Ancillary Patents in the 1993 License. (D.I. 98, Ex. C245-47.) In this letter, WARF explicitly acknowledged that "we recognize that this technology directly supports the Abbott Zemplar™ product and it is appropriate to add this to the licensed patent list." *Id.* In response, Abbott agreed that the 1993 License should be modified by a new license agreement (the "1998 License"), which would include the '815 Patent, as well as other method-of-treatment patents related to different disease conditions, and would expand the field of use to all "human therapeutics." (D.I. 98, Ex. C248-

7

49.) The July 28, 1998 License included a total of 31 patent families, 30 of which were solely owned by WARF. *Id*. at C27-C57.

Under the 1998 License, WARF granted Abbott nonexclusive rights to the '815 Patent at no additional cost. *Id*. at C29. The '497 and the '925 Patents were the only U.S. patents for which Abbott received an exclusive license. *Id*. at C37-38.[7] The 1998 License had the same royalty structure as the 1993 License, including the 7 percent cap on Abbott's royalty obligation. *Id*. at C29.

## 2.    The Parties' Conduct Post-Licensing

On October 26, 1998, WARF informed WashU that the '815 Patent had been included in the 1998 License, and that "Abbott Laboratories received approval of Zemplar® in April 1998, which was launched in late May 1998." *Id*. at C250. On November 25, 1998, WARF provided WashU with its first royalty report and payment, explaining the disbursement is "the first royalty revenue received from Abbott Laboratories for their product Zemplar®." *Id*. at C194-95. The letter included the calculation for the royalty payments: the amount of royalty income allocated to the '815 Patent from which was deducted the agreed-to 15 percent "Administration Fee" to determine the "Adjusted Royalty Income." *Id*. This amount divided by one-third yielded WashU's share of the royalties for the '815 Patent of which half was applied to patenting expenses and half was disbursed to WashU. *Id*. The letter closed with an invitation for WashU to contact WARF if it "ha[d] any questions or comments." *Id*. at C195. After this first royalty report and payment, WARF provided similar reports and disbursements to WashU in 1999, 2001 (twice), 2003 (twice), and annually from 2004 through 2014. *Id*. at B2-B3; C196-C233. Each royalty calculation was based on the same value that WARF assigned to the '815 Patent in 1998,

---

[7] These two patents were exclusively licensed to Abbott in the 1993 License.

and with every payment WARF invited WashU to contact it if there were any questions or concerns. *Id.* WashU endorsed and deposited all royalty checks from 1998 through 2014. *Id.* at D64-D71 at 208:15-235:9.

On April 4, 2001, WARF responded to WashU's inquiry regarding how WARF determined the percentages for the royalty payments to WashU under the IIA (the "2001 Letter"). (D.I. 1, Ex. B.) WARF explained that the compound patent family (the '497 and the '925 Patents, which were not subject to the IIA) were allocated 70 percent of the total royalty income, while the 31 "Ancillary Patents," which included the '815 Patent, and 30 other patents also not subject to the IIA, were allocated an equal share of the remaining 30 percent of the total royalty income, or .968 percent each. *Id.* As a result, under the IIA, WashU received one-third of the royalties for the '815 Patent, that is, "one-third of [the] .968 percent of the total royalties generated," less costs and expenses. *Id.* Although WARF stated that it "considers this information to be proprietary and confidential information of its licensee(s)," it advised WashU could "reverse the calculation provided to arrive at th[e] royalty amount paid to WARF." (*Id.*)

In 2011, Abbott listed the '815 Patent in the Orange Book for Zemplar. (D.I. 110, Ex. 38.) Beginning in 2012, WARF asserted the '815 Patent against eight generic drug companies, including Hospira. (D.I. 110, Ex. 40-47.) On September 27, 2012, WashU received a subpoena from Hospira regarding WARF's infringement action. (D.I. 101, Ex. 31.)

On January 30, 2013, WashU requested WARF to provide (1) the valuations assigned to other Orange Book-listed patents licensed to Abbott, (2) whether any calculations for Abbott-licensed patents changed since WARF's 2001 letter to WashU, (3) WARF's quarterly revenues under the Abbott license, (4) the identification of the other patents licensed with the '815 Patent

9

to Abbott, and (5) whether WARF's settlements with any generic Zemplar entrants led to royalty

payments to WashU and, if not, explain why not.  (D.I. 110 at 33.)

On February 7, 2013, WARF responded "[i]t is the compound patent [the '497 Patent]

that is the gatekeeper patent, without a license to it, the other patents directed to methods of

using paricalcitol are meaningless and largely irrelevant." (D.I. 110 at 34.)  WARF further

explained:

> With respect to any "valuations" of the '815 patent, it is our understanding that no
> further valuations have been done and that nothing has changed since WARF's
> 2001 letter to [WashU].  In terms of WARF's revenues under the Abbott license,
> [WashU] can figure those numbers based on the current percentage it receives
> each quarter, by dividing WARF's effective royalty rate.  Finally, as of today,
> there is no generic competition, so there are no current royalty payments from any
> generics to WARF.

(D.I. 110 at 34.)  The parties entered into pre-litigation discussions and executed a Litigation

Standstill and Tolling Agreement tolling the applicable statutes of limitations as of April 9, 2013.

(D.I. 101, Ex. E.)

WashU instituted this matter on December 26, 2013.  (D.I. 1.)  WashU raises three causes

of action against WARF.  First, it claims WARF:  breached the IIA by failing to assign a proper

value to the '815 Patent relative to the other intellectual property in the Abbott License;

underpaid WashU's royalties pursuant to the IIA; and failed to cooperate with WashU with

respect to licensing of the '815 Patent.  (D.I. 1 at ¶¶ 50-54).  Specifically, WashU argues that the

'815 Patent was worth far more than the value assigned by WARF, *id.* at ¶ 27; WARF

intentionally structured the Abbott license to avoid sharing its returns with WashU, *id.* at ¶¶ 42-

43.; and the IIA required WARF to provide WashU with information relating to the '815 Patent's

value, including the relative value assigned to other WARF-owned Zemplar patents in the

Orange Book.[8]  *Id.* at ¶¶ 33-37, 45.  Second, WashU asserts that WARF breached an implied

covenant of good faith and fair dealing contained in the IIA.  *Id.* at ¶¶ 55-59.  Finally, WashU

claims that WARF breached a fiduciary duty owed to WashU.  WashU posits that the nature of

the parties' relationship along with the "mutual benefit" and "cooperation" clauses in the IIA

gave rise to a fiduciary duty for WARF to safeguard WashU's interests, because WARF

explicitly committed to administer certain license agreements under the IIA for the parties'

mutual benefit and to cooperate.  *Id.* at ¶¶ 59-64.

## III.   STANDARD OF REVIEW

A grant of summary judgment pursuant to FED. R. CIV. P. 56 is appropriate if the

materials in the record, such as depositions, documents, electronically stored information,

admissions, interrogatory answers, affidavits and other evidence show that there is no genuine

issue to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV.

P. 56(a) and (c).  This standard applies to all types of cases, including matters related to patents.

*Johnston v. IVAC Corp.*, 885 F.2d 1574, 1576-77 (Fed. Cir. 1989).  The movant bears the burden

of establishing the lack of a genuinely disputed material fact by demonstrating "that there is an

absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S.

317, 325 (1986).  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if

evidence exists from which a rational person could conclude that the position of the person with

the burden of proof on the disputed issue is correct."  *Horowitz v. Fed. Kemper Life Assurance*

*Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (citations omitted).  "Where the record taken as a whole

could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue

---

[8] The valuation issue included whether any change in valuation occurred after WARF's 2001 letter, WARF's
quarterly revenues under the Abbott License, and identification of any lawsuits asserting the '815 Patent.

for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

quotation marks omitted).

This standard does not change merely because there are cross-motions for summary

judgment. *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987). Cross-motions

for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary judgment, and
> the making of such inherently contradictory claims does not constitute an agreement that
> if one is rejected the other is necessarily justified or that the losing party waives judicial
> consideration and determination whether genuine issues of material fact exist. *Rains v.
> Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

"The filing of cross-motions for summary judgment does not require the court to grant summary

judgment for either party." *Krupa v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).

## IV.   DISCUSSION

WashU has moved for partial summary judgment. (D.I. 96). It urges that the relative

value clause of the IIA requires WARF to assign a fair value to the '815 Patent in light of all

relevant circumstances, the implied covenant of good faith and fair dealing applies to the IIA,

and Wisconsin's six-year statute of limitations for contract claims does not preclude its action.

*Id.* WARF has also moved for summary judgment and dismissal of all counts raised by WashU.

(D.I. 99.) WARF argues that WashU's contract claims are barred by the six-year statute of

limitations, its breach of fiduciary duty is barred by the two-year statute of limitations, and

WashU unreasonably delayed in bringing suit to the economic prejudice of WARF, making all

claims barred by laches. *Id.* Finally, WARF argues it did not breach the IIA, nor the implied

covenant of good faith and fair dealing under the IIA, and it did not owe a fiduciary duty to

WashU. *Id.*

12

*A.*     ***Application of the Statute of Limitations to WashU's Contract Claims***

The parties agree that Wisconsin Statute Section 893.43 is applicable to WashU's breach

of contract and breach of implied covenant claims. *See* WIS. STAT. § 893.43(2013).  Section

893.43 provides that "[a]n action upon any contract . . . shall be commenced within 6 years after

the cause of action accrues or be barred."  The alleged breach of contract occurred on July 28,

1998 when WARF assigned the value to the '815 Patent and licensed it to Abbott.  (D.I. 98, Ex.

C27).  This suit was filed on December 26, 2013, well beyond the six-year statute of limitations.

Therefore, unless an exception applies, it is barred by the statute of limitations.

### 1. Annual Payment Exception

Nevertheless, WashU contends that each annual royalty payment from WARF constituted

a breach, and therefore, WashU may seek damages arising from all payments that accrued on or

after April 9, 2007, the date of WARF's latest annual royalty payment which violated of the

parties' IIA.  (D.I. 100 at 19).  WARF responds that the breach of contract was the calculation of

the assigned value, which occurred on July 28, 1998, and not the subsequent payments.  (D.I. 98,

Ex. C27).

Under Wisconsin law, "in an action for breach of contract, the cause of action accrues

and the statute of limitations begins to run from the moment the breach occurs.  This is true

whether or not the facts of the breach are known by the party having the right to the action."

*CLL Associates Ltd. P'ship v. Arrowhead Pac. Corp.*, 497 N.W.2d 115, 117 (Wis. 1993)

(citations omitted) (internal quotation marks omitted).  "If [a] promisor has a continuing duty to

perform, generally a new claim accrues for each separate breach." *Segall v. Hurwitz*, 339

N.W.2d 333, 343 (Wis. Ct. App. 1983) (citations omitted).  "The injured party may assert a

claim for damages from the date of the first breach within the period of limitation." *Id.*

13

However, "[a] continuing contract is capable not only of a series of partial breaches but also of a single total breach by repudiation or a material failure of performance." *Id.* (quoting 4 *Corbin on Contracts* § 956 at 841). "If a single total breach occurs, the right to bring an action accrues at that time and the statute of limitations begins to run." *Segall*, 339 N.W.2d at 343 (quoting 4 *Corbin on Contracts* § 989 at 967).

In *Messner Manor Associates v. Wisconsin Hous. & Econ. Dev. Auth.*, 555 N.W.2d 156 (Wis. Ct. App. 1996), the court determined that the six-year limitation period barred the plaintiff's breach-of-contract claim initiated in May 1990. The plaintiff had made all monthly housing payments based on a purportedly excessive interest rate fixed at closing in September 1978. *Id.* at 160. Despite the claimed miscalculation, the court found the payments did not constitute separate breaches because the parties agreed to the increased percentage rate. *Id.* The Wisconsin Court of Appeals recognized that periodic payments are not subject to the continuing contract rule when they stem from a purportedly erroneous calculation set in the first instance. *Id.* at 159-60.

WashU's claim for breach of contract is based on WARF's assignment of relative value in 1998, which governed all subsequent annual payments, the statute of limitations began to run in 1998, and WashU's breach of contract claim expired in 2004. WashU admits that its claims are based on a single total breach from WARF's alleged "failure to properly value the '815 Patent in the first place" in 1998. (D.I. 108 at 16.) "[I]n an action for breach of contract, the cause of action accrues and the statute of limitations begins to run from the moment the breach occurs." *CLL Associates Ltd. P'ship v. Arrowhead Pac. Corp.*, 497 N.W.2d 115, 117 (Wis. 1993) (citations omitted) (internal quotation marks omitted). Therefore, the action is time-barred.

## 2. Equitable Estoppel Exception

WashU also urges that WARF is equitably estopped from asserting the statute of

limitations defense against its breach of contract and breach of implied covenant of good faith

and fair dealing claims. Under Wisconsin law, the doctrine of equitable estoppel may entirely

bar a party from raising the statute of limitations as a defense. *State ex rel. Susedik v. Knutson*,

191 N.W.2d 23, 25 (Wis. 1971). "By definition, equitable estoppel is based upon the fraudulent

or other wrongful conduct on the part of the party asserting the statute of limitations and upon

the detrimental reliance on such fraudulent or wrongful conduct by the aggrieved party." *Hester*

*v. Williams*, 345 N.W.2d 426, 431 (Wis. 1984) (citing *Peters v. Kell*, 106 N.W.2d 407 (Wis.

1960)).

The test of whether a party should be estopped from asserting the statute of limitations is

"whether the conduct and representations of [the party] were so unfair and misleading as to

outbalance the public's interest in setting a limitation on bringing actions." *Knutson*, 191

N.W.2d at 25-26. "Affirmative conduct of the defendant may be equivalent to a representation

upon which the plaintiff may rely to his or her disadvantage; and. . . [a]ctual fraud, in a technical

sense, is not required." *Id.* at 26. However, "[f]or a court to invoke equitable estoppel, a party's

reliance on another's conduct must be reasonable." *Hester v. Williams*, 345 N.W.2d 426, 431

(Wis. 1984) (citations omitted) (internal quotation marks omitted). Furthermore, "[p]roof of

estoppel must be clear, satisfactory and convincing and is not to rest on mere inference or

conjecture." *Johnson v. Johnson*, 508 N.W.2d 19, 22 (Wis. Ct. App. 1993) (citing *Gonzalez v.*

*Teskey*, 465 N.W.2d 525, 530 (Wis. Ct. App. 1990)). Equitable estoppel is appropriate where:

"(1) [defendant] engaged in particular conduct — whether action or inaction or representations

— prior to the expiration of the limitation period; (2) [plaintiff] reasonably relied on that

conduct; (3) as a result of [its] reliance, [it] did not commence an action within the [limitations]

period; (4) after the inducement for delay ceased, [plaintiff] did not unreasonably delay in

bringing the action; and (5) [defendant's] conduct was so unfair and misleading as to outweigh

the public's interest in setting a limitation on bringing actions." *Elliott v. Gen. Cas. Co. of

Wisconsin*, No. 2011AP167, 2011 WL 5120370, *3 at ¶14 (Wis. Ct. App. Oct. 27, 2011)

(unpublished decision).

WashU argues that WARF's actions, inactions, or representations prevented it from

timely filing suit. The court analyzes evidence of WARF's conduct prior to the expiration of the

limitations period on July 28, 2004 in a light most favorable to WashU. WashU avers that

although in October 1995, Dr. Slatopolsky had properly assigned his interest in the '815 Patent

to it by executing a Patent Assignment, WARF recorded this assignment with the PTO the

following month under a cover sheet identifying *WARF* as the assignee. (D.I. 109, Ex. 23.) As a

result, the April 1996 Recordation form indicates, in part:

> Inventors:     Hector F. DeLuca, Eduardo Slatopolsky
> . . . .
> WHEREAS, the Wisconsin Alumni Research Foundation, Madison, Wisconsin,
> hereinafter called the "Licensor" has acquired by assignment from the inventor(s)
> the entire right, title and interest of the inventor(s) to such invention . . . .

(D.I. 98, Ex. 24 at 4.) WashU, however, does not dispute WARF's contention that the

assignment document attached to the cover sheet was accurate. *Id.*

Next, WashU points to an email exchange between Mary Loida, its licensing Case

Coordinator, and Gayle Kirkpatrick, a Licensing Associate at WARF. (D.I. 98, C244.) On May

13, 1998, Loida emailed Kirkpatrick the following:

Regarding our phone conversation . . .You mentioned an amendment with Abbott. Is there an actual license agreement, etc. that this amendment refers to that we can see? Dr. Neighbor would like to see any license and/or amendment that has either been executed or has the potential of being executed in the near future.  Please fax me any sort of agreement that is available . . . .

(D.I. 98, C244.)

Kirkpatrick responded the same day as follows:

Yes, we have an existing license agreement that, if the licensee agrees, will be amended to add this new case.  I did not mentioned [sic] the name of the licensee in our phone conversation.  I don't anticipate any objections from the licensee to adding this case and as required by our agreement, I will keep you informed of the licensing status of the case.  *As I mentioned in our phone conversation, this case is not currently licensed.  As per confidentiality provisions, I am not at liberty to provide you copies of our license agreements with any other parties. I would think that your office would have the same restrictions* . . . .

(D.I. 98, C244.) (emphasis added).

Finally, WashU relies on an April 4, 2001 letter from Jodie L. Armstrong, a WARF

accountant to a Kay Jinkerson at WashU.  (D.I. 1, Ex. B.)  This letter provides, in part:

It is WARF's policy to allocate evenly among these patents regardless of whether or not the patent is actually currently being used by the Licensee. This is because, in many cases, it is difficult if not impossible for WARF to determine whether or not the patent is being used by the Licensee at this time.  However, WARF believes that the patent adds some value to the entire portfolio and that, since the license runs to the last of the patents to expire there should be some blending over the lifetime of the License so that all patents in the License benefit from having been licensed.

(D.I. 1, Ex. B.)

The court must consider whether WashU reasonably relied on WARF's conduct and as a

result did not commence an action within the limitations period.  *Elliott v. Gen. Cas. Co. of

Wisconsin*, No. 2011AP167, 2011 WL 5120370, *5 at ¶22 (Wis. Ct. App. Oct. 27, 2011)

(unpublished decision) (citing *State ex rel. Susedik v. Knutson*, 191 N.W.2d 23, 25-26 (Wis.

1971)).  WashU does not dispute that it received a royalty report every year which detailed

WARF's basis for the royalty calculations, and that it was advised to reverse-calculate to

determine the amount WARF received from Abbott, as explicitly suggested in the April 4, 2001

letter. WashU does not suggest it ever attempted to reverse-calculate nor sought any further

information from WARF for at least twelve years. No action, inaction or representation by

WARF prevented WashU from determining the royalty payments.

Where a plaintiff knew or should have known of a potential cause of action against a

defendant within the statutory period, the court does not question whether the defendant may

have deliberately or fraudulently withheld information since that behavior has no causal

significance and does not prevent a statute of limitations defense. *KDC Foods, Inc. v. Gray,*

*Plant, Mooty, Mooty & Bennett, P.A.*, 763 F.3d 743, 754 (7th Cir. 2014) (applying Wisconsin

law). WashU is a sophisticated and experienced research university that negotiated

approximately 48 exclusive technology transfer licenses from 1981 to 1995 and received

substantial licensing revenue in 1995. WARF provided the basis for its calculation and

encouraged WashU to reverse calculate. Thus, any purported reliance on WARF's conduct does

not support WashU's inaction and silence for over twelve years.

At the latest, WashU knew the relative value WARF assigned to the '815 Patent by April

4, 2001, over two years prior to the expiration of the statute of limitations for contract actions.

Furthermore, WARF filed this lawsuit in 2013 based on the same information it had as of April

4, 2001. Therefore, the court must agree with WARF that its actions, inactions, or

representations did not prevent WashU from timely filing suit.

The ultimate inquiry is whether the evidence, viewed most favorably to the plaintiff,

supports a determination that the defendant's conduct was so unfair and misleading as to

outweigh the public's interest in the enforcement of the relevant period of limitations. *Elliott,*

No. 2011AP167, 2011 WL 5120370, *8 at ¶31. If the evidence does not support such a

determination, resolution of any factual dispute is unnecessary. The determination as to whether

a defendant's conduct was so unfair and misleading is a discretionary decision for the trial court.

*Id.* at ¶33. "[E]quitable estoppel is an equitable doctrine and . . . the decision whether to apply it

involves taking into account considerations other than the three elements [action/inaction,

reasonable reliance, failure to timely commence an action] that affect the equities." *Id.* (citing

*Nugent v. Slaght*, 638 N.W.2d 594, 602-603 (Wis. Ct. App. 2006)).

The record in this case reveals no evidence of inequitable conduct, such as WARF

improperly delaying then hastily terminating negotiations, thereby denying WashU sufficient

time to commence an action. *Elliott*, No. 2011AP167, 2011 WL 5120370, *11 at ¶42. Likewise,

evidence of an incorrect cover sheet, albeit with an accurate assignment document attached,

WARF's refusal to provide WashU a copy of the 1998 Abbott License, as well as its 2001 Letter

which explained WARF's allocation policies evince any inequitable conduct does little to

support the plaintiff's argument. WashU fails to show how an inaccurate cover sheet on the

assignment document was of any consequence when, indeed, the assignment document itself was

correct. WashU's argument that the improper recording of the assignment by the PTO prevented

it from learning about the Zemplar® litigations a few months earlier than it did, ignores that the

1995 Agreement authorizes WARF to litigate without giving notice to WashU.

WashU asserts that in the 1998 email, WARF misrepresented that non-existent

confidentiality provisions precluded it from providing WashU with copies of the 1998 Abbott

License. The relevant language reads:

> As per confidentiality provisions, I am not at liberty to provide you copies of our
> license agreements with any other parties. I would think that your office would
> have the same restrictions . . . .

19

(D.I. 98 at C244.) After receiving this response, WashU never raised the issue again.

> WashU also notes WARF's statement in its 2001 letter that:
> The compound patents are allocated seventy percent (70%) of the total royalty
> income in accordance with WARF's regular practice in licensing and allocating
> royalties in a suite of patents for its Vitamin D portfolio . . . .

(D.I. 1, Ex. B.)

WashU argues that an amendment to the 1993 License is evidence that WARF's practice

was not consistent with allocating a higher relative value to the compound patent family, and

thus this statement is misleading. Even if this practice was problematic, the court cannot fathom

how it prevented Wash U from performing a reverse calculation to arrive at the royalty amount

paid by Abbott. This amendment between WARF and Abbott merely expanded the Licensed

Field to include a new and different disease, multiple sclerosis. (D.I. 122, Ex. 1 at ¶ 8.) WashU

claims that WARF misleadingly implied in the 2001 letter that it could not determine whether

the '815 Patent was "actually currently being used" by Abbott.

> It is WARF's policy to allocate evenly among these patents regardless of whether
> or not the patent is actually currently being used by the Licensee. This is because,
> in many cases, it is difficult if not impossible for WARF to determine whether or
> not the patent is being used by the Licensee at this time . . . .

(D.I. 1, Ex. B.)

WashU argues this statement is an affirmative assertion by WARF that it was unable to

determine whether the '815 Patent was actually currently being used by Abbott. The court does

not agree. This comment is a general explanation of WARF's rationale of allocating royalty

income based on its knowledge of which patents a licensee may be using at a given time. The

letter advised how WARF allocated the royalty income attributing 70% to the compound patent

family and equally applying the remaining 30% to the remaining 31 ancillary patents, including

the '815 Patent. This information was sufficient for WashU to determine how WARF calculated and allocated the royalties as well as evaluate whether this method was inconsistent with the IIA.

Finally, the relationship of the parties is an important consideration in determining the application of equitable estoppel. *Elliott*, No. 2011AP167, 2011 WL 5120370, *12 at ¶ 50. In conducting its balancing analysis, the *Elliot* court found a heightened duty in the insurance context for an insurer towards its insured. *Id*. However, the court also stated, "[s]imilarly, outside the insurance context, as a general rule the negotiations between a plaintiff and a defendant prior to suit are not governed by a duty comparable to an insurer's special or fiduciary duty to its insured." *Id*.

"The interest served by statutes of limitations generally is to ensure prompt litigation of claims and to protect defendants from fraudulent or stale claims brought after memories have faded or evidence has been lost." *Elliott*, No. 2011AP167, 2011 WL 5120370, *13 at ¶ 51 (citing *Korkow v. General Cas. Co.*, 344 N.W.2d 108 (Wis. 1984)). Here, there is no evidence that WARF's conduct was so unfair or misleading as to require insulating Wash U from the application of the relevant statute of limitations provision. As a result, the claims are bared.

### B.   *Application of the Implied Covenant of Good Faith and Fair Dealing to the IIA*

WashU argues that the IIA incorporates the covenant of good faith and fair dealing and requires WARF to exercise its "authority" to assign relative values in good faith and fairly. (D.I. 100 at 18). WARF does not dispute that Wisconsin law recognizes an implied covenant of good faith and fair dealing in every contract. (D.I. 113 at 14); *Designer Direct, Inc. v. DeForest Redevelopment Auth.*, 313 F.3d 1036, 1046 (7th Cir. 2002). Clearly then, the IIA requires WARF to exercise its authority to assign relative values fairly and in good faith. Nevertheless, for the reasons already stated, WashU's implied covenant of good faith and fair dealing claim is

barred by the same six-year statute-of-limitations that applies to its breach of contract claim. *CLL Associates Ltd. P'ship v. Arrowhead Pac. Corp.*, 497 N.W.2d 115, 117 (Wis. 1993) (citations omitted) (internal quotation marks omitted).

## C.   *Breach of Fiduciary Duty*

WashU maintains that a fiduciary duty exists between the parties based upon their relationship and the mutual benefit clause of the IIA, which purportedly required WARF to safeguard its interests. WashU admits that the fiduciary duty it contends WARF owed to WashU "arose when the 1995 Agreement was signed or during the course of its performance, for example when WARF licensed the '815 patent to Abbott." (B7– B10.) Put simply, WashU's tort claim (breach of fiduciary duty) is barred by the applicable two-year statute of limitations. *See* Wi WIS. STAT. § 893.57 (2013);[10] *Lewis v. Paul Revere Life Ins. Co.*, 80 F. Supp. 2d 978, 1004 (E.D. Wis. 2000).

Moreover, the court doubts that a fiduciary duty or implied fiduciary existed. Under Wisconsin law, "Generally, fiduciary relationships arise in two situations: (1) where the relationship is created by contract or a formal legal relationship such as principal and agent, attorney and client, trust and trustee, guardian and ward, or (2) where implied in law due to the factual situation surrounding the transactions and relationships of the parties to each other and to the transactions in question." *Jackson v. McKay Davis Funeral Home, Inc.*, 830 F. Supp. 2d 635, 648 (E.D. Wis. 2011) (citing *Prod. Credit Ass'n of Lancaster v. Croft*, 423 N.W.2d 544, 546 (Wis. Ct. App. 1988) (citing *Denison State Bank v. Madeira*, 640 P.2d 1235, 1241 (Kan. 1982))). To create an express fiduciary relationship by contract, there must be a formal commitment that

---

[10] WIS. STAT § 893.57 (2013) was amended from two to three years on February 11, 2010. The three-year statute of limitations applies only to injuries on or after February 26, 2010.

places a greater obligation on one party to act for the benefit of the other, as in a trust agreement. *Merrill Lynch, Pierce, Fenner & Smith v. Boeck*, 377 N.W.2d 605, 609 (Wis. 1985). WashU argues that the IIA's mutual benefit clause served to impose an explicit contractual fiduciary duty upon WARF. This argument ignores that there must be "a formal commitment to act for the benefit of another . . . ." and that fiduciary relationships do not "arise out of every circumstance where there is a relationship of trust and confidence between the parties." *Id.* "A contract, standing alone, is insufficient to create a fiduciary duty." *Jackson*, 830 F. Supp. 2d 635, 648.

The undisputed facts demonstrate the IIA was an arms-length transaction between two sophisticated and experienced parties. It contained no express provision that would create a contractual fiduciary duty. The terms of the agreement did not require WARF to subordinate its interests to those of WashU. Nor does the IIA contain language that could be reasonably interpreted as creating a contractually based fiduciary duty. To the contrary the IIA recognizes that WARF's administration of the License Agreement was for the mutual benefit of *both* parties. (D.I. 1, Ex. A. at § 2.B.(ii).)

Wisconsin also recognizes an implied fiduciary duty that "arises from . . . special circumstances from which the law will assume an obligation to act for another's benefit." *Merrill Lynch*, 377 N.W.2d at 609. As just noted, an implied fiduciary duty does not arise out of every circumstance where there is a relationship of trust and confidence among the parties and a reliance on representations. *Id.* An implied fiduciary duty is "marked by inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of facts involved, or other conditions giving to one an advantage over the other.'" *Jackson*, 830 F. Supp. 2d at 649 (quoting *Prod. Credit Ass'n of Lancaster v. Croft*, 423 N.W.2d 544, 547 (Wis. Ct. App.

1988)).  Again, the parties enjoyed equal footing in this relationship.  Given this fact, the court

will not imply a duty in Washington's favor.

## V.   CONCLUSION

For the reasons stated above, WARF's motion for summary judgment on WashU's

claims of breach of contract, breach of implied covenant of good faith and fair dealing, and

breach of fiduciary duty is granted.  WashU's motion for summary judgment is granted in part as

to the application of the implied covenant of good faith and fair dealing.  An appropriate order

shall follow.

Dated: January _25_, 2016

UNITED STATES DISTRICT COURT